FILED

12/14/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

July 11, 2017 Session

## STATE OF TENNESSEE v. ANTONIO DURHAM

**Appeal from the Criminal Court for Shelby County**
No. 15-04366    James M. Lammey, Judge

_____

### No. W2016-02194-CCA-R3-CD

_____

A Shelby County Criminal Court Jury convicted the Appellant, Antonio Durham, of attempted rape, a Class C felony, and sexual battery, a Class E felony. After a sentencing hearing, the trial court merged the convictions and sentenced the Appellant to ten years in confinement. On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court erred by failing to instruct the jury on Class B misdemeanor assault as a lesser-included offense of attempted rape. The State claims that the trial court erred by merging the convictions. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court committed plain error by merging the Appellant's convictions and remand the case to the trial court for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right Judgment of the Criminal Court Affirmed in Part, Reversed in Part, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN JJ., joined.

Tony N. Brayton and Samuel Christian, Memphis, Tennessee, for the appellant, Antonio Durham.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tyler Parks and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

At trial, the then sixteen-year-old victim testified that on May 9, 2015, she was fifteen years old and went to "a Mother's Day party and an anniversary party" at her "uncle Danny's" house. Fifty to one hundred people attended the party. About midnight, the victim was sitting on the bed in her uncle's bedroom "in the back" of the house. She was watching television and using her cellular telephone. The Appellant, who was not related to the victim, came into the room. He was wearing a white shirt and blue jeans. The victim said he sat on the bed, stared at her, and talked to her. The victim was wearing earphones but could hear him talking. She stated, "[H]e said something about how the other people had thought he was drunk and told him to come back there with me." The Appellant then left the bedroom.

The victim testified that the Appellant returned to the bedroom, that he was wearing a blue shirt with yellow writing instead of the white shirt, and that he "pulled his pants down and showed me his penis." The Appellant's underwear was pulled up, but the victim could see through his underwear that his penis was erect. The victim said that she was lying at the foot of the bed and "trying not to look" and that the Appellant's pants were down for at least two minutes. He did not say anything to her and left the room. The victim used her grandmother's telephone to call her mother and told her mother to come pick her up.

The victim testified that about five minutes later, the Appellant returned to the bedroom and asked if he could borrow her telephone. The victim said no because she thought he was going to break it. The Appellant approached the victim, who was sitting on the bed, and she "scooted" away from him. She said she felt scared and uncomfortable and told him that she was "too young." The Appellant replied that "that's okay, we're all children" and pushed her down on the bed. He got on top of her, began kissing her neck, and pulled her tights and underwear down to her ankles. He also "touched" her breasts.

The victim testified that she thought the Appellant was trying to "rape" her. She kicked him off and pulled up her underwear and tights. The Appellant grabbed the victim, put her arms behind her back, and dragged her into the adjacent bedroom. The victim said that she fell onto a basket and that the basket "pierced" her skin. She screamed, and the Appellant left the room.

The victim testified that she went into the kitchen and told her grandmother that she was "almost raped." The victim was upset, angry, and crying. After she told her grandmother, she went back into her uncle's bedroom with some female family members. Her uncle took her outside to see if the Appellant was still at the party, but she did not see him at that time. She later saw him outside and saw that some people "had him by his arms trying to take him back to the house." The Appellant was still wearing the blue and

- 2 -

yellow shirt, and the victim told her uncle, "[T]hat's the guy." She said her uncle tried to "punch him so they backed him to the porch." The victim saw a knife on the porch and was going to stab the Appellant, but her grandmother stopped her. Later that night, the victim spoke with the police and told them what had happened. On May 11, 2015, she looked at a photograph array at the police department and selected the Appellant's photograph. She wrote on the photograph, "I was laying in the bed in the back room and this was the person who tried to rape me." The victim told the jury that she was "100 percent sure" the Appellant was the perpetrator.

On cross-examination, the victim testified that the first time the Appellant came into the bedroom, he stayed about five minutes and did not do anything unusual. He left the room and was gone about two minutes. The second time the Appellant came into the bedroom, he stayed about ten minutes and showed his penis to her for two to three minutes. The victim stated that he was standing up and "saying something" but that she did not remember what he said. She acknowledged that he was wearing boxer shorts and that she did not actually see his penis. The Appellant left the bedroom and was gone about five minutes. The victim said that she was not supposed to leave the room because "a lot of adults were in the house" and that she did not tell anyone about the Appellant's pulling his pants down because she "didn't think that was necessary at the time."

The victim testified that when the Appellant entered the bedroom the third time, he started to approach her in "a dangerously close way." She said that she backed up and told him she was too young and that he "proceeded to attack [her]." She stated that the Appellant was on top of her for two minutes, that she was crying and telling him to get off of her, and that he told her to shut up. The victim said the attack lasted "a good ten minutes." The Appellant did not hit the victim or tear her clothing during the attack, and she was not injured except for her falling onto the basket.

The victim testified that the Appellant pulled down her tights and underwear but that she never saw his penis. Defense counsel asked if the Appellant tried to insert his penis into her vagina, and she answered, "Not . . . to my knowledge. I wasn't going to let it happen and get that far." She then acknowledged that the Appellant was stronger than she and that he did not try to insert his penis into her vagina. She also acknowledged that he never touched her buttocks or "private areas." Defense counsel asked if the victim remembered testifying at a previous hearing, and she said yes. The following exchange then occurred:

> Q       Okay. And do you remember being asked a
> question by the State: Did he ever touch you with his hands
> anywhere? Do you remember being asked that question?

A       Yes.

Q       And do you remember your answer being:  His hands grazed my butt but that was it?

A       Yes.

Q       Is that correct?  But that was it; right?  So today you testified that he -- you said he grabbed your breasts today earlier.

A       Yes.

Q       Okay.  So these are two different statements.

A       No, not really.  That was, like, the only skin-on-skin contact that he did, but he did touch my breasts.

On redirect examination, the victim reiterated that when she testified that the Appellant touched only her buttocks, she meant that his touching her buttocks was the only "[s]kin-on-skin" contact.  The Appellant also touched her breasts, but her breasts "were clothed."  The victim acknowledged giving a statement to police on May 11, 2015, and saying in the statement that the Appellant was "grabbing my breasts between my leg[s] and attempted to pull my pants down/off."

Darron Rivers, the victim's grandmother, testified that she attended the party on May 9 and was in the kitchen frying fish when the victim came into the kitchen "crying, shaking, telling me that she had almost got raped."  Rivers and the victim went to the bedroom to try to find the Appellant, but he was gone.  Some family members found him "up on the corner" and brought him back to the house.  Rivers heard that her son was "jumping" the Appellant and went outside.  The Appellant got away from Rivers' son and ran to the side of the house, and the victim tried to stab the Appellant.  Rivers grabbed the victim's hand and told her that "you can't do that."  Rivers stayed with the victim until the police arrived.

On cross-examination, Rivers testified that the incident occurred about 9:30 or 10:30 p.m., that people were inside and outside the house, and that loud music was playing.  She said she did not know where the victim got the knife.

The victim's mother testified that she attended the party but left and received a text message from the victim.  She returned to the party, saw people leaving, and

- 4 -

wondered what was going on. The victim was standing on the porch and was "distraught" and crying. The victim told her mother what had happened, and her mother saw the Appellant "ran to get in the car." On cross-examination, the victim's mother denied hitting the Appellant.

Danny Royal testified that on May 9, 2015, he hosted a party for his wedding anniversary and his son's birthday. Forty to fifty people attended the party, and adults and children were present. The party lasted all day, but the children went home in the afternoon and the adults "stayed and finished the night out." The victim, who was Royal's "great great niece," attended the party, and Royal saw her in his bedroom. The Appellant, who was Royal's wife's great nephew, also attended. At first, the Appellant was wearing a white t-shirt. Royal later noticed, though, that the Appellant was wearing "something blue." The blue clothing turned out to be Royal's blue Grizzlies hoodie. Royal said that he had put the specially-painted hoodie on his bed so that he could show it to someone at the party.

Royal testified that at some point, he went into the kitchen and saw the Appellant go outside. The Appellant walked away from the crowd, which "kind of got [Royal's] attention." Royal saw the victim and some women standing in the doorway to his bedroom, and the victim was "screaming her head off." The victim could not say anything, but the women told Royal that "somebody done touched her or something like that."

On cross-examination, Royal testified that he went outside and saw someone "ushering" the Appellant away. At that point, Royal did not know who had touched the victim and asked what was going on. Someone said to take the Appellant away from the house, but Royal said that "if he did it, bring him back and call the police." Royal acknowledged that "quite a bit" of alcohol was served at the party and that he had consumed alcohol.

Officer Zachary Clark of the Memphis Police Department (MPD) testified that on May 9, 2015, he responded to a call involving the victim and arrived on the scene at 11:57 p.m. He described the scene as "kind of chaotic" with "a lot of people kind of getting loud, walking around." Officer Clark made contact with the victim. She was "really upset," and her "hair was disheveled like she had been in some type of altercation or fight." The victim was crying and appeared to be in shock. The perpetrator was not present, and Officer Clark broadcast a description of the vehicle the perpetrator was supposed to be driving over the police radio.

Sergeant Melvin Amerson of the MPD testified that he was the lead investigator for this case. On May 11, 2015, the victim came to the police department and gave a

statement. Sergeant Amerson created a six-photograph array and showed it to the victim. She immediately circled the Appellant's photograph.

Sergeant Amerson testified that he always encouraged victims of sexual assault to "get checked out" at the Rape Crisis Center but that he did not force them to go. He said victims should go to the Center immediately because "the longer you wait, the evidence is destroyed." He explained that even if penetration did not occur, "I still would ask that my victims go because you never know if there's semen . . . on clothing . . . . The examination consists of the nurses in the back doing their thing, examination and all of that trying to collect to see if there's something there." On cross-examination, Sergeant Amerson testified that he did not recall the victim's going to the Center or receiving medical treatment.

At the conclusion of Sergeant Amerson's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of attempted rape, a Class C felony, for attempting to penetrate the victim, and sexual battery, a Class E felony, for touching her breasts. After a sentencing hearing, the trial court merged the sexual battery conviction into the attempted rape conviction and sentenced the Appellant as a Range II, multiple offender to ten years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the convictions because the victim was the only witness to testify about the incident and the State presented no other evidence, such as medical evidence, to support her claims. The Appellant also contends that the evidence is insufficient to support the attempted rape conviction because the victim testified that he never attempted to penetrate her. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or

- 6 -

reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  This court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction."  State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

As charged in this case, rape is the "unlawful sexual penetration of a victim by the defendant" and "[f]orce or coercion is used to accomplish the act[.]"  Tenn. Code Ann. § 39-13-503(a)(1).  "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required."  Tenn. Code Ann. § 39-13-501(7).  Criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

- 7 -

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Sexual battery is "unlawful sexual contact with a victim by the defendant" and "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-505(a)(1). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

Regarding the Appellant's first claim, that the evidence is insufficient because the victim was the only witness to testify about the incident and the State presented no medical evidence to support her claims, the Appellant is essentially challenging the victim's credibility. However, questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

As to the Appellant's claim that the evidence is insufficient to support his attempted rape conviction because the victim testified that he did not try to penetrate her, taken in the light most favorable to the State, the evidence shows that the Appellant entered the bedroom and pulled down his pants so that the victim could see his erect penis through his underwear. He then exited the room but returned shortly thereafter. The victim backed away from the Appellant and told him that she was "too young [for sex]." Undeterred, the Appellant told her that "that's okay, we're all children"; pushed her down on the bed; and got on top of her. He kissed her neck and pulled down her tights and underwear to her ankles. The victim told the Appellant to get off of her, and he told her to shut up. Although the victim said that the Appellant did not try to insert his penis into her vagina, she said that she thought he was going to "rape" her and that she kicked him off of her. We believe a reasonable jury could infer from these facts that the Appellant intended to sexually penetrate the victim and that his forcing her onto the bed, telling her to shut up, and pulling her tights and underwear down to her ankles constituted a substantial step toward accomplishing the act. See State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *11 (Tenn. Crim. App. at Nashville, May 22, 1998) (stating that "[t]he jury could infer that restricting the victim's freedom of movement, shaving pubic hair without permission and subduing possible cries for help

- 8 -

were substantial steps towards penetration of the victim"). Thus, the evidence is sufficient to support his conviction of attempted rape.

## B. Jury Instructions

The Appellant contends that the trial court erred by failing to give his orally requested instruction for Class B misdemeanor assault as a lesser-included offense of attempted rape because Class B misdemeanor assault is a lesser-included offense under part (b) of the Burns test. The State argues that the issue is waived because the Appellant's request was not in writing and that he is not entitled to plain error relief because Class B misdemeanor assault is not a lesser-included offense of attempted rape. We agree with the State.

During the trial court's discussion of the jury charge with the parties, defense counsel requested that the trial court instruct the jury on Class B misdemeanor assault as a lesser-included offense of attempted rape. The trial court refused to give the requested instruction and did not instruct the jury on any lesser-included offenses of attempted rape.

Regarding the State's claim that the Appellant has waived the issue because he failed to make a written request for the instruction, Tennessee Code Annotated section 40-18-110(c) provides that when a defendant fails to make a written request for a lesser-included offense instruction, the issue is waived and may not be presented as a ground for relief in a motion for new trial or on appeal. Although the Appellant contends that we should address the issue because he "substantially complied" with the statute, subsection (c) makes it clear that his failure to make a written request waives the issue. See State v. Martin, 505 S.W.3d 492, 503 & n.8 (Tenn. 2016). Nevertheless, we may review the issue for plain error.

Relevant to this case, part (b) of the Burns test provides that an offense is a lesser-included offense if "it fails to meet the definition in part (a)[1] only in the respect that it contains a statutory element or elements establishing . . . a less serious harm or risk of harm to the same person, property or public interest." State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999); see State v. Howard, 504 S.W.3d 260, 270 (Tenn. 2016) (holding that subsections (f) and (g) of Tennessee Code Annotated section 40-18-110(f) did not abrogate part (b) of the Burns test and that part (b) continues to be applicable to determining whether an offense is a lesser-included offense). The elements of rape in this case are (1) unlawful sexual penetration, (2) accompanied by force or coercion, and

---

[1] Part (a) of Burns provides that an offense is a lesser-included offense if "all of its statutory elements are included within the statutory elements of the offense charged." State v. Burns, 6 S.W.3d 453, 466 (Tenn. 1997).

(3) the defendant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-503(a)(1); State v. Bowles, 52 S.W.3d 69, 79 & n.10 (Tenn. 2001). Class B misdemeanor assault occurs when a person "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a)(3), (b)(1)(A). As noted by the Appellant, this court has held that Class B misdemeanor assault is a lesser-included offense of rape under part (b)(2) of the Burns test and, therefore, that the facts of a case may warrant an instruction on misdemeanor assault. State v. David Gene Hooper, No. E2004-01053-CCA-R3-CD, 2005 WL 1981789, at *14 (Tenn. Crim. App. Aug. 16, 2005).

However, the greater offense in this case is attempted rape, not rape. In Bowles, our supreme court addressed whether sexual battery could be a lesser-included offense of attempted rape under part (b) of Burns. As stated previously, sexual battery is "unlawful sexual contact with a victim by the defendant" and "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-505(a)(1). Our supreme court held that although sexual battery is a lesser-included offense of rape under part (b) of Burns,[2] it cannot be a lesser-included offense of attempted rape under part (b) of Burns, explaining:

> the harm or risk of harm contemplated by sexual battery is not less serious than that contemplated by attempted rape. This is because an attempted rape does not necessarily involve any bodily contact at all, whereas a sexual battery always will involve an unlawful sexual contact.

Bowles, 52 S.W.3d at 79. As the court noted,

> We realize that, as a practical matter, the vast majority of attempted rape cases will involve bodily contact. Our focus, however, is strictly upon what the elements of each offense require and it is certainly conceivable, based on the statutory elements, that attempted rape could be proven in a case where no bodily contact had occurred.

Id. at 79 n.11.

Under the reasoning in Bowles, we conclude that Class B misdemeanor assault also is not a lesser-included offense of attempted rape because assault as charged in this

---

[2] Our Code now specifies that sexual battery is a lesser-included offense of rape. See Tenn. Code Ann. § 40-18-110(g)(4) (2009).

case always involves an unlawful sexual contact whereas attempted rape does not. Thus, the trial court did not breach a clear and unequivocal rule of law by failing to instruct the jury on Class B misdemeanor assault as a lesser-included offense of attempted rape, and the Appellant is not entitled to plain error relief. State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

## C. Merger

The State claims that the trial court erred by merging the Appellant's sexual battery conviction into his attempted rape conviction because (1) the Appellant was convicted of two separate offenses, i.e., attempted rape for his attempting to penetrate the victim and sexual battery for his touching her breasts; (2) sexual battery is not a lesser-included offense of attempted rape and, therefore, his dual convictions do not offend double jeopardy; and (3) his dual convictions do not violate due process concerns under State v. Barney, 986 S.W.2d 545 (Tenn. 1999). The Appellant argues that the trial court properly merged the convictions under Barney because the two acts were part of a single, continuous sexual episode. The State replies that State v. White, 362 S.W.3d 362 S.W.3d 559 (Tenn. 2012), overturned Barney and that double jeopardy is the proper analysis. The State also argues that even if Barney is still good law, the two acts in this case were "similarly distinct" under the Barney test. We conclude that the trial court committed plain error by merging the convictions.

At sentencing, the trial court sua sponte and without explanation merged the sexual battery conviction into the attempted rape conviction. The State did not object to the merger. On appeal, the State acknowledges that it may have waived the issue but requests that we review the merger for plain error. We conclude that the State's failure to object results in waiver. See State v. Jarus Smith, No. M2014-01130-CCA-R3-CD, 2015 WL 4656553, at *7 (Tenn. Crim. App. Aug. 6, 2015) (citing Tenn. R. App. P. 36(a) and noting that the same rules that apply to a defendant also apply to the State). However, if the trial court erroneously merged the convictions, the improper merger constitutes plain error. See State v. Jonathan Downey, No. M2013-01099-CCA-R3-CD, 2014 WL 820274, at *10 (Tenn. Crim. App. at Nashville, Feb. 28, 2014); State v. David Eugene Breezee, No. W2011-01231-CCA-R3-CD, 2012 WL 6728345, at *8 (Tenn. Crim. App. at Jackson, Dec. 28, 2012); State v. David E. Offutt, No. M2007-02728-CCA-R3-CD, 2009 WL 2567870, at *7 (Tenn. Crim. App. at Nashville, Aug. 20, 2009). Therefore, we will review the issue for plain error.

In State v. Anthony, 817 S.W.2d 299, 301 (Tenn. 1991), a jury convicted the defendant of the armed burglary of a Shoney's restaurant, the armed robbery of the restaurant's manager, and the aggravated kidnappings of the manager and five other employees. In a split decision, this court reversed all of the aggravated kidnapping

convictions, holding that "[u]nless independent and separate fact patterns for both the armed robbery and the aggravated kidnapping can be proven, appellant can be convicted of only the armed robbery." Anthony, 817 S.W.2d at 30. Our supreme court, citing due process concerns, held that before a separate kidnapping conviction can be sustained, there must be a determination of

> whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction.

Id. at 306. After its own analysis, our supreme court affirmed this court's decision. Id. at 307-08.

Later, in State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court modified the Anthony court's "essentially incidental" analysis and established a two-prong test for determining whether a separate conviction for kidnapping violates due process. The first step concerned a determination of whether the movement or confinement was beyond that necessary to commit the accompanying felony. Id. If so, the second step concerned ascertaining whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id.

In Barney, our supreme court concluded that "the 'essentially incidental' test, as developed in Anthony and its progeny, was not helpful in the context of sexual offenses because each separate sexual act 'is capable of producing its own attendant fear, humiliation, pain, and damage to the victim.'" 986 S.W.2d at 548 (quoting State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996)). Thus, the court set out a five-factor test for determining whether two or more sexual acts may be the subject of separate convictions. Id. The five factors were as follows:

> 1. temporal proximity-the greater the interval between the acts, the more likely the acts are separate;
>
> 2. spatial proximity-movement or re-positioning tends to suggest separate acts;
>
> 3. occurrence of an intervening event-an interruption tends to suggest separate acts;

4.  sequence of the acts-serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and

5.   the defendant's intent as evidenced by conduct and statements.

Id. at 548-49.  If the conduct supporting one of the convictions was "incidental, or merely preparatory in the sense of intending to around the victim or perpetrator," then the dual convictions violated due process.  Id. at 548.

In White, our supreme court expressly overruled Anthony and its progeny, holding that "[t]he separate due process test articulated first in Anthony, and subsequently refined in Dixon . . . , is . . . no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony."  362 S.W.3d at 578.  Instead, the court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law," thereby concluding that a defendant's constitutional concerns are protected by appellate review of the sufficiency of the convicting evidence.  Id. at 577-78.  Therefore, our supreme court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony."  Id.  To effectuate this end, our supreme court devised a jury instruction to be given by trial courts.  See id. at 580-81.

At oral argument in the instant case, the Appellant contended that the trial court properly merged his convictions under Barney while the State contended that White abrogated Barney, meaning that the proper analysis for the merger issue was double jeopardy.  In a recent case decided after oral arguments, our supreme court resolved the issue in favor of the State by expressly overruling Barney and holding that "the propriety of multiple convictions of sexual offenses arising from an allegedly single sexual assault must be analyzed under principles of double jeopardy as set forth by this Court in State v. Watkins, 362 S.W.3d 530 (Tenn. 2012)."  State v. Christopher Scottie Itzol-Deleon, ___ S.W.3d ___, No. M2014-02380-SC-R11-CD, 2017 WL 3668453, at *4 (Tenn. Aug. 25, 2017).  Thus, we turn to whether the Appellant's dual convictions in this case violate double jeopardy.  We note that "[w]hether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness."  State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014).

- 13 -

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See Watkins, 362 S.W.3d at 541. The instant case concerns the third category, protection against multiple punishments for the same offense in a single prosecution. "Multiple punishment claims fall into one of two categories: (1) unit-of-prosecution claims; or (2) multiple description claims." State v. Hogg, 448 S.W.3d 877, 885 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 543). Like Itzol-Deleon, the instant case involves multiple description claims because the Appellant is asserting that his convictions for violating two different statutes, i.e., the statutes for attempted rape and sexual battery, punish the same offense. See Itzol-Deleon, ___ S.W.3d ___, No. M2014-02380-SC-R11-CD, 2017 WL 3668453, at *4.

The "threshold inquiry" in multiple description claims is whether the dual convictions arose from the same act or transaction. Id. at *5. If so, a double jeopardy violation may exist. Id. In determining whether the convictions arose from the same act or transaction, our supreme court offered a "non-exclusive" nine-factor list for consideration. Id. at *12. Ironically, the court found Barney's five-factor test for due process analysis "helpful" in developing the following list for double jeopardy analysis:

> 1. The nature of the defendant's actions that are alleged to be in violation of the various statutes ("the defendant's actions");
>
> 2. The temporal proximity between the defendant's actions;
>
> 3. The spatial proximity of the physical locations in which the defendant's actions took place;
>
> 4. Whether the defendant's actions contacted different intimate areas of the victim's body and the degree of proximity of those areas to each other;
>
> 5. Whether the defendant's contact with different intimate areas of the victim's body was deliberate or merely incidental to facilitating contact with another intimate area;
>
> 6. Whether the defendant deliberately used different parts of his body (or objects) to assault the victim sexually;

7.  Whether the defendant's assault was interrupted by some event, giving him an opportunity to either cease his assault or re-form a subsequent intent to commit a subsequent assault;

8.  Indications of the defendant's intent to commit one or more than one sexual assault on the victim; and

9.  The extent to which any of the defendant's actions were merely ancillary to, prefatory to, or congruent with, any of his other actions, thereby indicating unitary conduct.

Id. at *8, 12.

The State argues that the Appellant's act of forcing the victim onto the bed and pulling down her tights and underwear was distinct from his act of "groping" her breasts. However, applying the factors espoused in Itzol-Deleon to the facts and circumstances in this case, we disagree with the State. The proof established that the Appellant came into the bedroom, where the victim was sitting on the bed. The Appellant got on top of her for two minutes, pulled down her tights and underwear, and touched her breasts over her clothes. The victim kicked off the Appellant and pulled up her tights and underwear.

The proof does not show that there was a pause in time or a change in location between the Appellant's pulling down the victim's tights and underwear and his touching her breasts. Granted, the Appellant's actions contacted different parts of the victim's body. However, the proof does not establish whether his contact with the victim's breasts was deliberate or merely incidental. The victim obviously was struggling with the Appellant. Moreover, although the State contends that the Appellant "groped" her breasts, the victim testified on both direct and cross-examination that he "touched" her breasts. The Appellant did not tear her clothing or reach under her clothing to touch her bare breasts. There was no interruption between the physical contacts, and the Appellant did not say anything to indicate that he intended to commit more than one sexual assault on the victim. Therefore, we conclude that the Appellant's convictions of attempted rape and sexual battery arose out of the same transaction

Having determined that a possible double jeopardy violation exists, we next consider the statutory elements of the two offenses. Id. at *13. As our supreme court has explained,

If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General

Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

Watkins, 362 S.W.3d at 557.

Our supreme court has already determined that sexual battery is not a lesser-included offense of attempted rape under any part of Burns. Bowles, 52 S.W.3d at 79; see Tenn. Code Ann. § 40-18-110(f) (effectively codifying parts (a) and (c) of the Burns test). Furthermore, sexual battery has not been named as a lesser-included offense of attempted rape under Tennessee Code Annotated section 40-18-110(g), which specifies certain lesser-included offenses. Finally, the elements of the offenses are not the same. See State v. Dallas Jay Stewart, No. M2011-01994-CCA-R3-CD, 2013 WL 3820992, at *36 (Tenn. Crim. App. at Nashville, July 22, 2013) (concluding that the elements of aggravated sexual battery, which requires sexual contact for the purpose of sexual arousal or gratification, and rape of a child, which requires sexual penetration but does not require that the purpose be for sexual arousal or gratification, are not the same). Therefore, we are constrained to hold that the Appellant's dual convictions do not violate double jeopardy. Accordingly, the trial court committed plain error by merging the convictions.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court committed plain error by merging the Appellant's convictions for attempted rape and sexual battery. Therefore, the case is remanded to the trial court for resentencing.

_____
NORMA MCGEE OGLE, JUDGE